JUDE D. LOISELLE *v.* BROWNING AND BROWNING REAL ESTATE, LLC, ET AL.
(AC 34780)

Gruendel, Robinson and Pellegrino, Js.

Argued September 18—officially released December 24, 2013

*Michael J. Rose*, for the appellant (plaintiff).

*Mark R. Cramer*, for the appellee (named defendant et al.).

*Opinion*

PELLEGRINO, J. The plaintiff, Jude Loiselle, appeals from the judgment of the trial court rendered in favor of the defendants, Browning & Browning Real Estate, LLC (Browning), Mary Beth Malin, and Raymond Preece.[1] On appeal, the plaintiff claims the trial court erred in (1) improperly admitting into evidence a portion of Malin's testimony at trial; (2) failing to find that Malin intended to interfere with the plaintiff's contractual relations; and (3) failing to address whether the conduct of the defendants violated public policy pursuant to General Statutes § 42-110a et seq., the Connecticut Unfair Trade Practices Act (CUTPA). We affirm the judgment of the trial court.

The court found the following facts. The plaintiff's action arises out of the sale of residential real estate in Thompson, Connecticut (property). In December, 2009, after the property had been foreclosed, GMAC ResCap (GMAC) listed the property for sale with Browning for $144,900.[2] The relevant terms of the listing agreement, entered into by Browning and GMAC on March 9, 2010, were: (1) all offers must be in writing and signed; (2) offers must be mailed to a certain address or faxed; (3) Browning must notify GMAC before mailing

---

[1] U.S. Bank, N.A, Theresa E. Browning, the Cabrera Group, LLC, and David Cabrera also were defendants before the trial court but are not parties to this appeal. We refer in this opinion to Browning, Malin, and Preece collectively as the defendants

[2] GMAC was the servicing agent for U.S. Bank, N.A., the bank that had foreclosed the property. GMAC was named as seller in the listing agreement.

or faxing an offer; and (4) back-up offers are "encouraged" on all properties already under contract.

The listing agreement between Browning and GMAC was based on a form contract that had been drafted eight years earlier in 2002. The terms of the listing agreement, however, had not been updated to reflect the technological developments in the field. The listing agreement did not account for the fact that, in 2005, GMAC began to require that their real estate agents use the Equator system, a computer interface where the listing agents and GMAC electronically exchange information regarding the property. Using the Equator system to communicate offers was inconsistent with the express terms of the listing agreement requiring that offers be mailed or faxed. Despite the language of the listing agreement, GMAC preferred to conduct business electronically using the Equator system.

Malin, an employee at Browning, was the listing agent for the property. GMAC regularly had reduced the purchase price of the property to no avail. Three prospective buyers previously had backed out of purchasing the property, one due to an unsatisfactory inspection. On the morning of April 21, 2010, however, Malin received two offers for the property, one from the plaintiff and one from The Cabrera Group, LLC (Cabrera).

In April, 2010, the plaintiff saw the property and was interested in buying it. On the morning of April 21, 2010, JoAnn Hall, the plaintiff's real estate agent, submitted an offer on his behalf to Malin. The plaintiff's offer was for $94,900 with a $1000 deposit, contingent on satisfactory well and sewage inspections. The plaintiff's father had provided Hall with a check for the down payment, a letter stating he was giving his son cash to purchase the property, and a copy of an investment account statement reflecting a $12 million balance. Hall conveyed the offer to Malin.

On that same morning, April 21, 2010, Cabrera also made an offer to purchase the property. Cabrera was in the business of buying homes at favorable prices, renovating them, and then reselling them for a profit. Cabrera had been represented by Preece, also an agent at Browning, for nine years and together they had closed approximately fifteen real estate transactions. Preece would notify Cabrera of new listings, recommend specific properties, and place bids on behalf of Cabrera with little prior discussion. Preece had been monitoring the property in question for Cabrera. On April 7, 2010, Cabrera and GMAC began negotiating the purchase of the property through Preece and Malin. On the morning of April 21, 2010, Preece gave Malin a written purchase and sale agreement for the property, offering to pay $90,000 with a $3000 deposit and no contingencies.

Malin submitted both Cabrera's offer and the plaintiff's offer to GMAC using the Equator system on the morning of April 21, 2010. Neither potential buyer knew of the other's offer. With respect to the Cabrera bid, Malin noted in the Equator system, "No inspections. Taking the property AS IS." Malin also commented on the plaintiff's bid that he was "performing home inspections. I am very concerned with the results with what we know. Very concerned with home inspections and repairs." Malin, on behalf of GMAC, then sent an e-mail to Hall stating, "[GMAC] countered with that they want a [$3000 earnest money deposit]. Everything else is fine for them. Let me know. I also left you a message at our office." The plaintiff responded with a counteroffer for the same price, but the additional deposit of $2000 would be provided only upon acceptance. Malin did not accept or reject this counteroffer, but responded that GMAC needed proof of funds.[3]

---

[3] For some unknown reason, when Hall provided Malin with the plaintiff's initial offer, the father's investment account statement was never received. In response to Malin's request, Hall resubmitted the statement.

On the evening of April 21, 2010, Malin checked the status of the outstanding offers on the property and found GMAC had accepted the Cabrera offer. Malin notified Hall by e-mail that the plaintiff's offer had been rejected and that GMAC had accepted an offer from another bidder. On April 22, 2010, Hall saw the e-mail and replied: "[The plaintiff] agreed to the [counteroffer]. How can the seller accept another offer and not give my buyer notice to make highest and best?"[4] Malin relayed a message to the plaintiff, explaining that GMAC had considered the Cabrera offer to be "a stronger cash offer ready to close asap without inspections." The plaintiff refused to abandon his effort to purchase the property and attempted to submit another offer through Malin. The Equator system, however, would not allow Malin to enter any other offers. Malin wrote back to Hall and explained, "I am not able to present [your offer] as the seller has accepted another offer. [O]nce an offer is accepted the [Equator] system locks me out." After closing, Cabrera spent between $6000 and $8000 on repairs and improvements before reselling the property for $149,000.

The plaintiff commenced the present action on June 2, 2010, and proceeded to trial against the defendants. The plaintiff alleged Malin committed tortious interference with contractual relations and negligent misrepresentation, and sought to hold Browning vicariously liable as Malin's employer. The plaintiff also alleged that the defendants had "conspired to thwart" the plaintiff's

---

[4] We note that, contrary to Hall's statement, the plaintiff did not accept GMAC's counteroffer. Although the terms of the plaintiff's response were the same as GMAC's counteroffer—a purchase price of $94,900 with a $3000 deposit—the plaintiff's counteroffer made $2000 of the deposit contingent on GMAC's acceptance. The plaintiff therefore had not accepted the counteroffer because his acceptance was conditional. See *Bridgeport Pipe Engineering Co.* v. *DeMatteo Construction Co.*, 159 Conn. 242, 246, 268 A.2d 391 (1970) ("[t]he acceptance of the offer must, however, be explicit, full and unconditional").

real estate transaction in violation of CUTPA. In its memorandum of decision, the trial court found in favor of the defendants on all claims. This appeal followed. Additional facts will be set forth as needed.

## I

The plaintiff claims the court erroneously admitted a portion of Malin's testimony regarding the Equator computer system. Specifically, the plaintiff argues this testimony violates the parol evidence rule and should have been excluded because it conflicts with the provisions of the listing agreement. The plaintiff also argues that Malin should not have been allowed to testify as to what the Equator program "required" because this testimony constitutes hearsay. We conclude that the testimony was properly admitted.

## A

Before we reach the merits of the arguments raised in the plaintiff's brief, we consider the more fundamental legal question: whether a third party, not a beneficiary of the contract or a party to the contract, can question the terms of the contract by invoking the parol evidence rule. While the plaintiff argues in his brief that the parol evidence rule should exclude evidence of a change in the contract, he ignored the fundamental question as to whether a nonparty could invoke this rule. The defendants raised this issue in their brief, but the plaintiff failed to address it and did not file a reply brief.[5] At oral argument before this court, however, the plaintiff argued there is "no case [law]" that prohibits a third party from invoking the parol evidence rule when a party to the contract testifies as to a change in the terms of the contract. The issue we now address is

[5] Although the plaintiff did not brief this issue, he had an opportunity to present arguments in a reply brief but did not, and therefore the issue is properly before this court. Cf. *Haynes* v. *Middletown*, 306 Conn. 471, 473–74, 50 A.3d 880 (2012).

whether a third party, who is a stranger to a contract, can invoke the parol evidence rule when a party to the contract testifies as to a change in the terms of the contract.[6]

"As we have so often noted, the parol evidence rule is not a rule of evidence, but a substantive rule of contract law." (Internal quotation marks omitted.) *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, 231 Conn. 756, 779, 653 A.2d 122 (1995). "Because the parol evidence rule is not an exclusionary rule of evidence, however, but a rule of substantive contract law . . . the [plaintiff's] claim involves a question of law to which we afford plenary review." (Internal quotation marks omitted.) *Alstom Power, Inc.* v. *Balcke-Durr, Inc.*, 269 Conn. 599, 609, 849 A.2d 804 (2004).

Generally, the parol evidence rule prevents parties from using extrinsic evidence to vary or contradict the unambiguous terms of an integrated contract. Id., 609–610. When deciding whether the parol evidence rule operates to prevent the trier of fact from considering certain evidence to interpret the contract, "[t]he fundamental question is . . . the intent of the parties." *Harris* v. *Clinton*, 142 Conn. 204, 210, 112 A.2d 885 (1955). We use the parties' intent to guide us in order to ensure "parties [continue] to enter into contractual agreements with the confidence that they subsequently will not find themselves legally bound to unknown or unanticipated obligations." *Grigerik* v. *Sharpe*, 247 Conn. 293, 311, 721 A.2d 526 (1998). This advances the "policy of certainty in enforcing contracts. That is, each party to a contract is entitled to know the scope of his or her obligations thereunder [including] . . . the range of potential third persons who may enforce the terms of the contract." (Internal quotation marks omitted.) *Gazo* v. *Stamford*, 255 Conn. 245, 261–62, 765 A.2d 505 (2001).

---

[6] The plaintiff does not claim to be a third party beneficiary of the listing agreement.

Parol evidence generally cannot be admitted to interpret or contradict the terms of an unambiguous contract that contains a merger clause. *Tallmadge Bros.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 502–503, 746 A.2d 1277 (2000). A merger clause manifests the parties' "inten[t] to make [the contract] the repository of their final understanding" and enforce it as such. *Harris* v. *Clinton*, supra, 142 Conn. 211. A merger clause is not evidence, however, of the parties' intent with respect to the rights of a third party to use extrinsic evidence to vary a contract's express terms. Our Supreme Court's discussion in *Gazo* v. *Stamford*, supra, 255 Conn. 261, regarding the rights of third party beneficiaries, is instructive: "The law regarding the creation of contract rights in third parties in Connecticut . . . is well settled. . . . [T]he ultimate test to be applied . . . is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party . . . . [T]he only way a contract could create [such] a direct obligation . . . [would be] because the parties to the contract so intended." (Citations omitted; internal quotation marks omitted.) "It is well settled that one who [is] neither a party to a contract or a contemplated beneficiary thereof cannot sue to enforce the promise of the contract . . . ." (Internal quotation marks omitted.) *Tomlinson* v. *Board of Education*, 226 Conn. 704, 718, 629 A.2d 333 (1993).

A third party, therefore, cannot enforce the obligations imposed by a merger clause, including the parol evidence rule, on a contracting party without first demonstrating that the contracting parties intended for those obligations to run to the third party. See *Gazo* v. *Stamford*, supra, 255 Conn. 261. To allow third parties to use the parol evidence rule freely, absent evidence of the contracting parties' intent, would inhibit contracting

parties from "knowing the scope of his or her obligations [under the contract], includ[ing] the range of third parties who may enforce the terms of the contract." Id., 261–62.[7]

Other related case law provides further support for the proposition that third parties cannot invoke the parol evidence rule. Our Supreme Court acknowledged the inherent inequity in allowing third parties to benefit from the parol evidence rule, and carved out a limited exception to allow the introduction of extrinsic evidence to interpret the terms of a general release from liability. *Sims* v. *Honda Motor Co.*, 225 Conn. 401, 416, 623 A.2d 995 (1993). In doing so, the court noted: "[O]ther jurisdictions have held that the parol evidence rule does not bar extrinsic evidence of the parties' intent if it is a stranger to the contract who seeks to prevent the introduction of extrinsic evidence. . . . These courts take an unsympathetic position toward parties who seek to take gratuitous advantage of an agreement when they are not parties to the agreement." (Citations omitted; internal quotation marks omitted.) Id.; see also 11 R. Lord, Williston on Contracts (4th Ed. 1999) § 33:9, pp. 594–97 (weight of authority prohibits strangers from invoking parol evidence rule). Furthermore, a third party is not bound by the parol evidence rule; see *Crowley* v. *Pendleton*, 46 Conn. 62, 64 (1878); and, accordingly, should also not be allowed to use the rule to its advantage. In order to protect the policy of certainty in enforcing contracts, and following the guidance of our Supreme Court, we hold a third party cannot invoke the parol evidence rule against a contracting party.

---

[7] We note that, in this case, there was no evidence that the listing agreement was ambiguous. Absent this finding, not even the parties to the contract could have claimed the parol evidence rule prevented evidence of a deviation from the terms, let alone a nonparty and total stranger to the listing agreement. See *Schilberg Integrated Materials Corp.* v. *Continental Casualty Co.*, 263 Conn. 245, 277, 819 A.2d 773 (2003).

The plaintiff, as a stranger to the listing agreement, cannot invoke the parol evidence rule to prevent Malin from testifying regarding the Equator system. We acknowledge that the use of the Equator system was not included in the written listing agreement. We are guided by the intent of the contracting parties, however, and there was no evidence whatsoever that Browning and GMAC intended that any third party stranger could invoke the parol evidence rule. In fact, there was evidence to the contrary that the parties to the contract had agreed to use the Equator system. Despite the fact that Malin's testimony may not have been in accord with the terms of the listing agreement, the trial court did not err in concluding the parol evidence rule was not pertinent, as the plaintiff had no right to invoke it.

B

The plaintiff also argues that the court erred in allowing Malin to testify that she was required to use the Equator system to communicate with GMAC. He argues this testimony constituted hearsay because "[Malin] was clearly testifying based on what someone allegedly told her to do." We find no error.

The following additional facts are relevant to this claim. The plaintiff called Malin as a witness and questioned her about the Equator system, among other things. During Malin's cross-examination, the defendants asked: "[O]nce GMAC required you to use the Equator system you were required to notify the seller of all offers through the Equator system, not by telephone, correct?" The court sustained the plaintiff's objection on hearsay grounds, reasoning the defendants were "asking what GMAC requires [Malin] to do." The defendants modified the question to the court's satisfaction, asking, "Once GMAC required you to use the Equator system that system required you to notify the seller of all offers through the Equator system, not by telephone,

correct?" The plaintiff's subsequent objections were overruled[8] because the court found the question was not soliciting hearsay—Malin was being asked to "describ[e] how the equipment works, how the software works" and not testifying as to what GMAC told her. Malin responded, "Correct," to these cross-examination questions.[9]

Our Supreme Court has recently reaffirmed the standard of review for claims regarding hearsay. "To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review." *State* v. *Miguel C.*, 305 Conn. 562, 571, 46 A.3d 126 (2012).

" 'Hearsay' means a statement, other than one made by the declarant while testifying at the proceeding, offered in evidence to prove the truth of the matter asserted." Conn. Code Evid. § 8-1 (3). Subject to certain exceptions, hearsay is inadmissible. See Conn. Code Evid. § 8-2. A "statement" is defined as "an oral or written assertion or . . . nonverbal conduct of a person, if it is intended by the person as an assertion." Conn. Code Evid. § 8-1 (1). There are "certain circumstances when, although the witness did not repeat the statements of another person, his or her testimony presented to the jury, by implication, the substance of another person's statements." *State* v. *Jones*, 44 Conn.

---

[8] After the initial objection, which was sustained, the plaintiff objected two additional times to the question as rephrased.

[9] We agree with the defendants that the plaintiff mischaracterizes the nature of Malin's testimony. The plaintiff's brief reads: "Malin testified that 'someone' told her that she had to use the Equator system . . . ." (Emphasis omitted.) The plaintiff does not refer us to anywhere in the record where Malin stated she was told to use the Equator system.

App. 476, 486, 691 A.2d 14, cert. denied, 241 Conn. 901, 693 A.2d 304 (1997). Under these circumstances, a witness has "implied" an out-of-court statement of another by testifying to the witness' own verbal or nonverbal response to an identifiable conversation. See, e.g., *State* v. *Robinson*, 213 Conn. 243, 257–59, 567 A.2d 243 (1989) (witness' testimony she was concerned for victim after phone call constituted hearsay), overruled on other grounds by *State* v. *Colon*, 257 Conn. 587, 600–601, 778 A.2d 875 (2001).

In the present case, the plaintiff has failed to explain how Malin's responses constitute or imply an out-of-court statement was made by GMAC. The defendants did not ask Malin what GMAC said, and did not solicit testimony that could have implied what GMAC said during an identifiable conversation. The defendants asked Malin how the Equator system affected her communications with GMAC—whether she used the Equator system exclusively or used other means as well. The plaintiff has not shown that the defendants asked about the substance of Malin's communications with GMAC, or that they solicited a response implying as much. The plaintiff cannot demonstrate what out-of-court statement Malin testified to, and therefore the court did not err in concluding this portion of Malin's testimony was not hearsay. We conclude Malin's testimony was properly admitted.

## II

The plaintiff challenges the trial court's factual findings with respect to the claim of tortious interference with contractual relations. Specifically, the plaintiff argues that the court erred with respect to the tortious interference with contractual relations claim in finding: (1) Malin did not intend to interfere with the plaintiff's contractual relations; (2) the alleged interference was not tortious; and (3) the plaintiff did not suffer an actual

loss. We conclude that these findings were not clearly erroneous.

The court's determinations regarding Malin's intent, whether Malin tortiously interfered with the plaintiff's contract, and the issue of damages are all findings of fact. *Mather* v. *Griffin Hospital*, 207 Conn. 125, 138, 540 A.2d 666 (1988); see *Quimby* v. *Kimberly Clark Corp.*, 28 Conn. App. 660, 667–68, 613 A.2d 838 (1992). "Because this claim challenges the accuracy of the court's factual findings, our review is limited to the clearly erroneous standard. In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . [A] finding of fact must stand if, on the basis of the evidence before the court and the reasonable inferences to be drawn from that evidence, a trier of fact reasonably could have found as it did." (Citations omitted; internal quotation marks omitted.) *D'Appollonio* v. *Griffo-Brandao*, 138 Conn. App. 304, 318, 53 A.3d 1013 (2012).

"A claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff was caused by the tortious conduct." (Internal quotation marks omitted.) *Appleton* v. *Board of Education*, 254 Conn. 205, 212–13, 757 A.2d 1059 (2000). The plaintiff must satisfy his burden of proving

each and every element of the claim. See id., 213. "[N]ot every act that disturbs a contract or business expectancy is actionable. . . . [A]n action for intentional interference with [contractual] relations . . . requires the plaintiff to plead and prove at least some improper motives or improper means. . . . [A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." (Internal quotation marks omitted.) *Metcoff* v. *Lebovics*, 123 Conn. App. 512, 520, 2 A.3d 942 (2010).

We conclude there is support in the record for the trial court's factual finding that there was no tortious interference with the plaintiff's contractual relations. The record shows that Malin satisfied her obligation as the seller's agent when she conveyed her reservations regarding the plaintiff's offer as a result of the inspection contingency. This is sufficient support for the court's finding that Malin's actions were not improper or wrongful. See id., 520–21. Even though Malin did not follow the telephone and fax procedures detailed in the listing agreement, this also was entirely proper, as the testimony demonstrated that all agents used the Equator system to communicate offers. The court did not err in concluding the plaintiff did not satisfy his burden of showing Malin improperly interfered with the bidding process, which was fatal to his claim of tortious interference with contractual relations.[10]

III

With respect to the CUTPA claim, the plaintiff argues the "court never addressed the essential element of the CUTPA claim—whether there was a violation of public

---

[10] Alternatively, we note that there was no error because it was not clearly erroneous for the court to find Malin did not intend to improperly interfere with the contractual relationship or that the plaintiff failed to prove he suffered any damages, which were also essential elements of this claim.

policy."[11] The plaintiff also claims that "there is a clear violation of public policy, supporting the CUTPA claim." We conclude the court considered whether there was a violation of public policy, and did not err in finding none.

The plaintiff asserts it was plain error for the court not to address the public policy element of his CUTPA claim. "Plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *Santopietro* v. *New Haven*, 239 Conn. 207, 216, 682 A.2d 106 (1996). In order to succeed on a CUTPA claim, the plaintiff must prove the defendant's conduct "offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is at least within the penumbra of some common law, statutory, or other established concept of unfairness." (Internal quotation marks omitted.) *American Car Rental, Inc.* v. *Commissioner of Consumer Protection*, 273 Conn. 296, 305–306, 869 A.2d 1198 (2005).

With respect to the claim here, the court recounted that "whether a practice is unfair depends upon the finding of a violation of an identifiable public policy," and concluded "[t]he plaintiff failed to prove any law or public policy violations . . . ." The court reasoned that Malin gave "fair and accurate" evaluations of the competing offers, required similar information from both buyers, did not violate any disclosure requirements regarding the fact that both agents worked at Browning,

---

[11] Because we conclude there was no error with respect to the tortious interference claim, we do not need to address the plaintiff's proposition, based on *Sportsmen's Boating Corp.* v. *Hensley*, 192 Conn. 747, 756–57, 474 A.2d 780 (1984), that "proof of the elements of a common law tortious interference claim must lead to a finding of a violation of CUTPA as long as there has also been a violation of public policy."

and that the plaintiff failed to show Malin deviated from the "customary and normal" practices in the industry. The court recognized the public policy requirement of CUTPA, and addressed it accordingly.

The plaintiff also argues the facts here demonstrate a violation of public policy pursuant to CUTPA. Whether a practice is unfair and thus violates CUTPA is an issue of fact and is subject to the clearly erroneous standard of review. *Tarka* v. *Filipovic*, 45 Conn. App. 46, 55, 694 A.2d 824, cert. denied, 242 Conn. 903, 697 A.2d 363 (1997); see also *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 228, 990 A.2d 326 (2010). The court found there was no CUTPA violation because Malin evaluated the competing bids appropriately, treated the plaintiff and Cabrera equally, and that any deviations from the listing agreement "violated no state laws or [any of] the plaintiff's rights." In light of the foregoing, it was reasonable for the court to find there was no violation of public policy for purposes of CUTPA. We conclude the trial court did not err in its disposition of the CUTPA claim.

The judgment is affirmed.

In this opinion the other judges concurred.